## No. 31,549

The Kansas Life Insurance Company, *Appellee* and *Cross Appellant*, v. Anthony Kireilis, *Appellant*.

(33 P. 2d 155.)

Opinion filed June 9, 1934.

*Paul W. Appelgate*, of Wakeeney, and *E. C. Flood*, of Hays, for the appellant.

*Robert W. Hemphill*, *J. F. Bennett*, both of Norton, and *John R. Parsons*, of Wakeeney, for appellee and cross appellant.

The opinion of the court was delivered by

Johnston, C. J.: This action was brought by the Kansas Life

Insurance Company against Anthony Kireilis to foreclose a mortgage purporting to have been executed by him on a quarter section of land in Trego county, issued to secure the payment of a note for $1,500.

It was alleged by the defendant that the note and mortgage were forged by Peter Kireilis, brother of Anthony, and in 1923, before Anthony Kireilis went to Lithuania, he had given to his brother a power of attorney to lease or sell the land and make deeds of the same, describing it. There was no power given in the instrument to mortgage or place liens upon the land, and it is conceded that the notes and mortgage were forged. Anthony Kireilis, before leaving the United States in 1925, deposited in the Stock Yards Savings Bank of Chicago, $5,000. Shortly afterwards, in 1926, he drew from the bank $1,500, and the balance, $3,500, was drawn out by Peter in checks issued by Peter Kireilis that were forgeries and the account was closed by the bank at that time in 1926.

In 1927 Anthony Kireilis drew upon the bank for $1,000 through his brother, and the bank account having been exhausted without the knowledge or consent of Anthony, Peter executed and forged the note and mortgage in question. There was no pretense that it was executed under the power of attorney. From the proceeds of this note and mortgage, Peter drew and sent to Anthony a bank draft for $1,000. Anthony did not learn before the trial that the $1,000 sent to him was a part of the proceeds of the mortgage and the note made to Benton, the assignor of plaintiff. Having found that Anthony Kireilis had been paid $1,000 out of the loan, the court charged him with that amount and gave the bank judgment for the same.

On certain sales of royalties on the land Peter had issued deeds that were held to be valid and within the authority granted under the power of attorney. The court decreed that plaintiff should be credited with $1,000 and given judgment against Anthony for the amount he had received, and quieted the defendant's title as against the plaintiff insurance company and his codefendants, except the holders of the oil and gas royalties. The findings, setting out the facts and judgment in greater detail, follow:

1. The defendant, Anthony Kireilis, made, executed and delivered to his brother, Peter Kireilis, a power of attorney, dated May 7, 1923, a copy of which is attached to the reply of the plaintiff filed in this action; said power

of attorney was not recorded, however, among the records of Trego county, Kansas, until the 26th day of October, 1932.

2. Neither the mortgage nor the note secured thereby, nor any of the coupons thereto attached, all of which are dated July 11, 1927, were executed by the defendant, Anthony Kireilis.

3. The royalty deed, dated January 3, 1930, marked "Plaintiff's Exhibit 12," was not executed in person by the defendant, Anthony Kireilis.

4. The defendant, Anthony Kireilis, was absent from the United States from the month of July, 1925, until the month of June, 1932, and the evidence shows that during said time he was staying in Lithuania.

5. At the time of leaving the United States the defendant, Anthony Kireilis, had $5,000 on deposit in the Stock Yards Savings Bank of Chicago. In 1926 the defendant drew out $1,500 of this money while he was in Lithuania, and the balance of the fund was drawn out of said bank on checks forged by Peter Kireilis during the year 1926, and said account was closed by said bank in the month of December, 1926.

6. In the summer of 1927 Anthony Kireilis drew upon said bank, through his brother, Peter Kireilis, for $1,000. In order to meet said request for money said Peter Kireilis, without the knowledge or authority from his brother, Anthony Kireilis, executed the note and mortgage sued upon in this action, and forged thereto the name of Anthony Kireilis.

7. From the proceeds of the loan thus obtained Peter Kireilis sent to his brother, Anthony Kireilis, in Lithuania a draft for $1,000, which Anthony Kireilis thereafter received and cashed, supposing it was a part of the money he had on deposit in the said Stock Yards Savings Bank of Chicago.

8. Upon his return home from Lithuania in June, 1932, said Anthony Kireilis discovered that his money in said Stock Yards Savings Bank had been drawn out in the year 1926, on checks signed by Peter Kireilis without authority, and he subsequently learned that his brother had executed in his name the note and mortgage sued on in this case.

9. Anthony Kireilis did not learn at any time before the trial of this action that the $1,000 sent him by his brother in August, 1927, was part of the proceeds of the loan made by the plaintiff's assignor.

10. Upon his return home from Lithuania in June, 1932, and after making an investigation of his affairs, the defendant, Anthony Kireilis, made a claim against the Stock Yards Savings Bank of Chicago, Ill., for the sum of $4,000 and accrued interest upon his savings account. The claim was afterwards compromised by the defendant, Anthony Kireilis, and said Stock Yards Savings Bank by the payment by said bank to the defendant, Anthony Kireilis, of the sum of about $3,100.

### Conclusions of Law

1. On the findings of fact, which the court now adopts and ratifies, the court believes that the plaintiff is entitled to recover from Anthony Kireilis the sum of $1,000 with 6 per cent thereon from February 1, 1931.

2. That the defendant Anthony Kireilis is entitled to have his title quieted as against the mortgage held by the plaintiff.

And further held that the royalty deeds were valid.

In the pleadings plaintiff alleged that Peter Kireilis, who made the note and mortgage, was authorized to look after the business of Anthony while he was in Lithuania, with power to sell or lease the property upon which he had made a mortgage. He was authorized by the power of attorney to make deeds and conveyances and do everything in the premises as fully and to all intents and purposes as if Anthony himself were personally present, but it is conceded that power to mortgage the land was not given.

It was further alleged that the note and mortgage appeared to be signed, acknowledged and recorded and appeared to be valid; that $1,000 of the amount derived from the mortgage was paid to Anthony Kireilis, and he still retains that amount, but he did not learn that the money received from his brother was the proceeds of the mortgage until the time of the trial. When he did learn that fact he did not offer to return the money he had received. He did learn about it, however, at the trial, and before judgment was rendered. He learned then that the mortgage had been forged by his brother, and was not a binding obligation, but he also learned that the money paid on the invalid mortgage had been received by himself. He and the plaintiff both had been deceived by the wrong of Peter.

The plaintiff was insisting that the transaction was in court for settlement, and since the mortgage was executed by one having no authority to do so, the question arose what was equitable and just under the facts? The foreclosure was an equitable proceeding, and the pleadings raised the question as to whether the money received and kept by Anthony should be returned to plaintiff when the mortgage was set aside.

The trial court, to whom the question was submitted, evidently proceeded on the theory of quasi contract, money had and received, or unjust enrichment of a party. When Anthony returned from Lithuania in the early part of 1932 and learned that the money left in the Stock Yards Bank had been drawn out and appropriated by Peter, he demanded the money paid out on the forged checks. In an accounting, compromise and settlement between him and the bank, he was paid the sum of $3,100. It is argued that this settlement shows that Anthony was not enriched by the receipt of the $1,000, and it does not appear to have had any effect in the controversy with the plaintiff. It was a compromise settlement, and what considerations entered into it is not shown. It was a separate and dis-

tinct transaction from the controversy between the plaintiff and the defendant, and the plaintiff was not a party to it and had nothing to do with the compromise. Defendant owned the land and appointed his brother to manage and control it with power to sell it but without authority to the brother to mortgage it. He drew upon his brother for $1,000, no doubt thinking it was in the bank. He had left quite a sum of money on deposit in the Chicago bank and supposedly drew on that fund, but Peter had already drawn and misappropriated the money and therefore signed a mortgage on the farm that he was managing for $1,500 and of its proceeds he sent $1,000 to Anthony, which the latter still holds. Anthony did not know that the $1,000 was the proceeds of the mortgage. The party to whom the mortgage was made paid $1,500 to defendant's brother, and $1,000 of that amount was paid to Anthony. When the foreclosure action was begun it developed that the mortgage was a forgery. Both of the parties, the owner of the invalid mortgage and the defendant, were innocent of any wrong, but one of them must suffer. Anthony Kireilis had $1,000 of the money obtained on the instrument. He was insisting that the mortgage was invalid and should be so declared and that the $1,000 which he had received by virtue of the invalid instrument and which had enriched him to that extent, should be retained. When the pleadings were filed and proof of the facts was presented, he learned that he had received a part of the proceeds obtained on the void mortgage. He then learned that he had been enriched by the transaction to the extent of the amount received. He did not then offer to pay or credit the plaintiff with this amount, but persisted in his theory that the mortgage being void he did not owe the plaintiff anything on it or on the money received by him. The claim is something in the nature of a quasi contract, is contractual in its nature, and to the extent of the money so received he is enriched and is liable to the one who paid it on the illegal mortgage.

There is an excuse that he did not earlier recognize his liability, as there is a finding that he did not learn until the time of the trial that the $1,000 received by him from his brother was the proceeds of the invalid mortgage, but when he did learn of it, he fought out the case insisting that he was not liable for the amount paid to him. In *Wagon Co. v. Wilson*, 79 Kan. 633, 101 Pac. 4, an agreement had been made by an agent without authority, and the principal, who was the plaintiff, received a note given in the transaction,

but the plaintiff did not know of the agreement until the time of the trial. It was there said:

"But when at the trial in the district court on appeal they asserted that the note sued on was given in consideration of a promise made by Kennedy that the commissions in dispute should be paid, it was incumbent on the plaintiff either to abandon its claim so far as it was based upon the note and rely upon proving the account which was merged therein or else take the chances of being able to disprove that the note was given in pursuance of the agreement alleged. In continuing to rely on the note after being advised of the defendants' claim the plaintiff must be deemed to have elected to pursue the latter course, and thereby to have waived the question of the agent's authority if in fact the note should be shown to have been the fruit of such agreement." (p. 637.)

So here, where the defendant discovered that the money received by him was derived from the giving of a void mortgage, he did not return or tender a return of the money, but persisted in his contention that nothing was due from him by virtue of the payment so received.

The action was of an equitable nature, involved equitable considerations and it was a just and equitable demand that the money received in the invalid transaction should be returned, and we think the court had authority to finally decree that it should be returned by the defendant.

In 21 R. C. L. 932 it is said as to benefits received or retained by the principal of an agent who acted beyond his authority that—

"It is an established principle of law that where a person acts for another, who accepts the fruits of his efforts, the latter must be deemed to have adopted the methods employed, as he may not, even though innocent, receive the benefits and at the same time disclaim responsibility for the measures by which they were acquired. With the benefits of the contract he must accept the responsibilities. If he does not wish to adopt the transaction he must return anything that he may have received as a result thereof. Where a principal sends forth his agent to conduct his affairs and contract for his benefit, and the agent procures a contract by fraudulent or corrupt practices, although the principal may not have been privy in any way to such conduct of his agent, yet by claiming the benefit of the contract he must take it tainted as it may be with such practices. . . . It is a generally recognized doctrine of equity that where a principal obtains the benefit of a loan procured by his agent acting without authority, he thereby ratifies the unauthorized contract, and makes himself liable to the lender for the sum received. And it is immaterial that the lender was informed as to the agent's lack of authority. Where money is borrowed on behalf of a principal by an agent, the lender believing that the agent has authority, though in fact his act has not been authorized or ratified, the principal cannot be sued at law; but in equity, to

the extent to which the money borrowed has in fact been applied in paying obligations of the principal, the lender is entitled to stand in the same position as if the money had originally been borrowed by the principal."

We conclude that the judgment awarding plaintiff the return of the money received by defendant was just and equitable.

Some objections are made to the admission of evidence and further that the findings are without sufficient support, but upon examination they do not appear to be material. Those relating to the settlement made with the Stock Yards Savings Bank of Chicago relate to a different and distinct transaction and have no particular bearing on the point in controversy in this case. Besides, only a part of the evidence received is preserved in the record.

Finding no error in the proceedings, the judgment is affirmed.